VAN WINKLE & COMPANY *vs.* WILKINS *et al.*

1. Failure of machinery to be of the class contracted for, and to be completed by the time stipulated, are both matters for reducing the contract price in a suit for the same, when damages result.
2. The measure of damage as to the class or quality is the difference in value between the machinery contracted for and that furnished. (The measure of damage for delay is the loss sustained; if the loss be on cotton-seed which have deteriorated by keeping, the difference in value of the seed as they were when the machinery ought to have been ready, and as they were when it was actually ready for their manufacture, is the measure.
3. Damages which may reasonably be considered as in contemplation of the parties when the contract was made are not too remote. Hence, damage to cotton-seed purchased in anticipation of starting an oil-mill at the time appointed in the contract for machinery, may be recovered when such purchase was foreseen and expected by both parties.

4. Parol evidence is admissible to show that the time specified in the written contract for the completion of the machinery was regarded as essential, and also to show that the purchase of cotton-seed in advance in order to have the same ready for the manufacture of oil by that time, was contemplated.

5. If a partner is competent to contract for the firm at all, he is competent to make time of the essence, and bind the partnership to the legal incidents of so doing.

6. A contract to furnish machinery for a first-class oil-mill is not to be construed as meaning first-class of the particular manufacturer making the contract, but first-class generally.

7. One who contracts for machinery as first-class and has made expensive preparations to use it, has a right, in receiving it, to rely upon its being first-class; and so receiving it is no waiver of defects nor any bar to urging them in reduction of the agreed price. Receiving it after the time stipulated for delivery is no waiver of damages resulting from breach by delay. And a sale of the mill, or its transfer to a corporation created to run it, will neither waive a just deduction from the price of the machinery, nor invest the new purchaser or the corporation with any right of action against the manufacturer or first seller.

8. General questions touching the case and the various issues involved in it, are not objectionable, whether the witness under examination in open court be a party to the action or not.

9. The rejection of some competent evidence will not necessarily work a new trial.

10. When the verdict is so much with interest, the interest is to be computed from maturity of the contract declared on; and if less principal is found than the last instalment of that contract, the maturity of such instalment is the date from which to compute interest.

May 2, 1888.

Contracts. Damages. Evidence. Partnership. Waiver. Witness. Practice. Interest. Before Judge Roney. Burke superior court. November term, 1887.

The declaration contained a count on a written contract, a count for the price and value of machinery sold, a count for the price and value of work done and materials furnished, and a count for money due on an account stated. The suit was by E. Van Winkle & Company against W. A. Wilkins, and J. H. McKenzie and

Robert C. Neely (partners under the firm name of Mc-
Kenzie & Neely), and William E. Jones.   The contract
sued on provided, in substance, that E. Van Winkle &
Company should furnish, deliver and put in first-class.
running order, everything complete by October 25, 1885,
in the buildings of the defendants, a large lot of ma-
chinery (specifying it) for a cotton-seed oil-mill, it being-
understood that everything was to be furnished which
was "needed in a first-class oil-mill of the average ca-
pacity of twenty-five to thirty tons per day, and all to
be of first-class material and workmanship, and of amply
sufficient size, strength and weight for the work and
endurance required"; that all breaking which should
occur within a year should be repaired free of charge by
plaintiffs, unless it was caused by carelessness, and if'
any of the parts were not of sufficient capacity for the
work, they were to make them so ; that the defendants
should erect such buildings as should be called for by
the plans and specifications furnished by the plaintiffs
and have them ready in time ; that they were to furnish
brick, mortar and cement for all the foundations, ma-
sons to do the work and such rough labor as should be
required to handle the machinery in putting it up ; and
they agree to pay $11,250 for the machinery and mate-
rial, half to be paid when the same was turned over in
first-class running order, and the other half within six
months from that date, with interest at eight per cent.,
unless they preferred to pay cash.   They also agreed to
pay $450 freight.

The defendants pleaded (1) the general issue; (2) that
they had been damaged $20,000 by plaintiffs' failure to
comply with the contract, because the plaintiffs did not
start the mill and put the machinery in complete run-
ning order until twenty-one working days after the day
on which they agreed to do this had expired, which, at.

the guaranteed capacity of the mill, would make a loss of $10,000. By reason of plaintiffs' failure to furnish the mill and machinery of the full capacity guaranteed in their contract, the defendants say they were damaged $10,000 more, which they set up by way of set-off and recoupment. These pleas were filed January 17, 1887.

The defendants further pleaded that the alleged liability to plaintiffs in the contract was created for machinery and material of the kind and character described in the contract, and that the machinery and material furnished were not of the kind, character or description therein agreed to be delivered, and were not everything needed in a first-class mill of an average capacity of twenty-five to thirty tons per day; nor were they of first-class material and workmanship, nor of sufficient size, strength and weight for the work and endurance required, but were defective, not suited to a mill of such capacity, not of first-class material and workmanship, and not of sufficient strength, size and weight for the work and endurance required, of which defendants were ignorant, but of which plaintiffs had full notice and knowledge; by reason whereof there has been a failure of consideration. Further, defendants say that the machinery and material furnished were of a kind which rendered it absolutely impossible, by examination and inspection thereof, for them to determine whether it came up to the standard and degree of excellence mentioned in the contract, and its true nature and qualities could be discovered only by actual use and employment of it after delivery; that, relying on the warranty and representation of the plaintiffs, on the 18th day of November, 1885, plaintiffs turned over said machinery and material, and defendants began to use and employ it for the purposes for which plaintiffs knew it had been bought, and thereupon found that plaintiffs, well knowing its defective

condition, had not delivered machinery and material of the kind or description warranted by them, nor would it, under the most favorable circumstances, do the amount of work they guaranteed it would; and the machinery and material actually delivered were of the value of only $4,500, while that contracted for was worth $11,250; wherefore they said they were damaged, and prayed an abatement to the extent of $6,750.

For further plea defendants said that, by reason of the failure, neglect and refusal of plaintiffs to carry out and perform the cross obligations and independent covenants arising under the contract, they had damaged defendants in the sum of $10,000, in that whereas they undertook and promised to furnish, deliver and put in first-class running order, everything complete, the machinery and material in the contract described, for a cotton-seed oil-mill of the average capacity of twenty-five to thirty tons per day by the 25th day of October, 1885, and defendants, relying on said agreement, proceeded, with actual notice to plaintiffs, to purchase and lay in a supply of cotton-seed that would be necessary to keep a mill of such average capacity running, and bought and had on hand on the date named 1,333 tons of seed; that cotton-seed is a commodity which cannot be bought in large quantities for use when required, but has to be bought in small quantities and accumulated; that when the contract was made, this was known by plaintiffs and defendants, and the fact that defendants, in advance of the completion of the mill for running, must, would and should purchase cotton-seed in view of the contract having been made, was in the actual contemplation of the parties; that after the execution of the contract, defendants proceeded to buy, haul and store, in such quantities as they could, cotton-seed fit and necessary for the running of the mill, and on the 25th

v 81—7

of October had on hand and on the way 1,333 tons at an expense of $16,762.50, incurred after the making of the contract and before the breach thereof by plaintiffs, the same being only a reasonable quantity and not more than the needful and advance supply for the proper running of a mill of the average capacity of twenty-five to thirty tons per day, to be ready for running at the time contracted for; that plaintiffs knew at the time the contract was made what the machinery and material were ordered for; that in the month of October, the defendants, having on hand and on the way 360 tons of seed, and seeing that the plaintiffs were so far behind in the work that they would not have it ready on the 25th, discontinued the purchase of seed, of which the plaintiffs had notice, and thereupon came to defendants and insisted that they should keep on buying, as the mill would be ready to start, and when it did it would work so well and fast that it would soon reduce the quantity of seed, and there would be no risk from damaged seed; that defendants, relying on their contract and the statement of plaintiffs, continued to buy reasonable and proper quantities, with the notice and knowledge of plaintiffs, who, not regarding their contract, failed and neglected to have the machinery and mill ready for running on the 25th of October, and did not have it ready until the 18th of November, and further failed and neglected to furnish material and machinery of the capacity and kind contracted for, that furnished being of the average capacity of only fifteen to eighteen tons per day; by reason whereof, and in spite of all proper care and caution of defendants, the cotton-seed bought became heated and damaged, and the product of the mill, instead of being of the character and value it would have been had plaintiffs complied with their contract, was defective, deficient, of lower grade,

less value and less quantity than it should have been; that the seed thus damaged by delay was, to the extent of the damage, to wit, $4,200, lost to defendants solely by plaintiffs' neglect and default; and the damage sustained by defendants by reason of the delay and the failure of the mill to be of the capacity guaranteed in producing oil, etc. to the extent of $——, were such damages as entered into the contemplation of the parties when the contract was made, and actually, naturally, etc. flowed from its breach. Wherefore defendants said they had been damaged $10,065, which they prayed might be deducted by way of recoupment, and that they might have judgment against the plaintiffs for the excess.

For further plea, the defendants said the plaintiffs were indebted to them in the sum of $433.64 on an account, of which they attached a bill of particulars.

The testimony introduced was conflicting on nearly every material feature of the case. The jury, under the charge of the court, returned a verdict for the plaintiff for $4,622.81, with interest. The plaintiffs moved for a new trial on the following among other grounds:

(1) Because the court refused to allow Van Winkle to testify how many oil-mills of the same character as the one in question had been built by his firm.

(2) Because the court permitted Van Winkle to testify, on cross-examination, as to events occurring before the signing of the contract, particularly how the date named in the contract was fixed at October 25 instead of October 15.

(3) Because the court ruled out certain interrogatories which would prove that the witnesses who answered them were owners and managers of oil-mills, located at Hogansville and other points in Georgia, the exact character and capacity of the mills in question, each of which

was erected by plaintiffs, and was a first-class manufacture; the object being to establish what was first-class oil-mill machinery, and the meaning of such term as applied to the construction and erection of such machinery by Van Winkle & Co.

(4) Because Wilkins was allowed to answer the following question: State the facts of this case, what loss you sustained on account of the delay, what the delay was, how long it lasted, what damage it caused, whether or not the machinery was according to contract, in what respect it varied, and the loss from that source;—the ground of objection being that the witness was a party defendant and an attorney, and would be permitted to state his whole case without proper indication in advance directing the attention of counsel on the other side as to whether what he would say would be relevant or not, or positive or hearsay; plaintiffs' counsel insisting that the question should be divided, so that any question propounded might be the subject of exception.

(5) Because the court permitted the following questions to be asked Wilkins: I want to ask you this question: If at the time of making this contract, the purpose for which the mill was desired was or was not discussed between you and Mr. Van Winkle as to the requirements as to cotton-seed for the manufacture of the products of the mill,—was or was it not discussed between the parties, both parties; whether or not subsequently in the prosecution of the contract it was discussed.

(6) Because the witness Wilkins was allowed to testify in response to this question: In the progress of the execution of this contract, state whether there was or was not any conversation where Mr. Van Winkle advised you to buy seed;—the ground of objection being that it was not within the scope of the authority of Van Winkle, as

agent of his partner, to bind the firm by any such statement.

(7) Because the court overruled the objection to the following question to, and refused to exclude the answer of, W. E. Jones: You have heard the testimony of Mr. Van Winkle and Major Wilkins; now state what occurred in the interview resulting in that contract with reference to the time, giving additional time. The witness answered: We were talking about making the contract; we asked Mr. Van Winkle what time he would have the mill ready; I think the first thing he said was, the first of October; Mr. Van Winkle said he would not be bound by any time; Major Wilkins said, then consider trade off.

(8) Because the court refused to allow Van Winkle to testify in rebuttal as to D. A. Tompkins, the agent of an opposition oil-mill company, in answer to the following questions: Is it not to the interest of the corporation, and has it not been their purpose, to break down smaller manufactories?

(9) Because the court refused to allow the introduction, in rebuttal, of the testimony of the witnesses set forth in the 3d ground

(10) Because the verdict is vague and uncertain, in that it bears interest without fixing any date from which it should run; the suit being on a contract payable in instalments, one of which bears interest six months anterior to the other.

(11) Because the verdict is contrary to evidence and good conscience, in that the finding was for a sum less than either instalment sued for, and necessarily allowed the whole claim for loss on cotton-seed as having occurred solely from the delay in starting the machinery, and no deduction being made for the care, trouble, risk,

responsibility and expense of manufacture, and for prices realized from the sale of the product.

The motion was overruled, and the plaintiffs excepted.

FRANK H. MILLER and P. P. JOHNSTON. for plaintiffs.

FOSTER & LAMAR, J. J. JONES and R. O. LOVETT, for defendants.

BLECKLEY, Chief Justice.

1. In defence to an action upon a contract to manufacture machinery for a cotton-seed oil-mill, a deduction from the contract price was claimed on two grounds: (1) that the machinery was not first-class, the contract being to supply machinery of that class; and (2) that a delay of some days occurred in completing the work, in consequence of which loss occurred from the decay or deterioration of cotton-seed that had been purchased for use in the mill. The court, in ruling upon the pleas and in charging the jury, recognized both elements of defence, and we think, correctly.

2. The principle, as to measure of damages, laid down with reference to deduction from the agreed price on account of defective machinery was the difference between the contract price and the actual value of the machinery supplied; and in reference to the cotton-seed, the measure of damages recognized in the charge of the court was the difference between the value of the seed before they were damaged by delay and their value in their damaged condition. We approve these measurements.

3. It was contended that the damage from the spoiled cotton-seed was too remote and uncertain; but we think not, as the court restricted the jury to the damage contemplated by the parties in the contract. If the damage

was not such as was within the contemplation of the
parties, it was not matter for recoupment, but if it was
within the contemplation of the parties at the time the
contract was made, it was the subject-matter of recoup-
ment.

4. Parol evidence, we think, was admissible to show
whether such damage was in the contemplation of the
parties. The contract named a time for the machinery
to be ready to be put up, and the parol evidence simply
went to illustrate the question of whether that time was
of the essence of the contract, and whether the purchase
of cotton-seed in advance, and therefore the damage
,which resulted from supplying a stock of seed and keep-
ing it on hand with a view to having it ready to run the
machinery when the time arrived, was within the contem-
plation of the parties. There was no error in the con-
trolling principles applied by the court in the trial of
the case.

5. Van Winkle represented the firm of which he was
a member in agreeing to the terms and stipulations of
the contract. That he was competent as a partner to
contract in behalf of the firm touching its business is
not controverted, but it is said that he could not, with-
out some special delegation of power to him by his co-
partners, render time of the essence of any contract, and
bind the firm to abide the legal consequences of so doing.
We see no virtue in this position except that of bold and
courageous novelty.

6. When a manufacturer contracts to supply a first-
class article, there is no reason for understanding him
as stipulating with reference to his own productions, and
them only, as a criterion. Why should he be allowed
to make the standard and the article both, unless for so
doing he provides expressly in his contract? A first-
class cotton-seed oil-mill, and a first-class Van Winkle

cotton-seed oil-mill might be very different articles, and very different in value. First-class machinery of a given kind is such as corresponds with the best of the kind in general use, not merely with the best of a single manufacturer; unless, indeed, the two superlatives coincide, in which case to realize one would be to realize the other also.

7. It was urged in argument that receiving the machinery was a waiver both of its defects and of damages resulting from its non-delivery in due time. Why so? After expensive preparations to have and use a mill, it was probably much better to have one of inferior quality than none at all. Besides, it was perhaps only by trial that the defects were discoverable by the purchasers. Indeed, the evidence appears to so indicate. Under the circumstances, there was no obligation to return the machinery or to offer to return it. The purchasers had a right to rely upon its being first-class until it proved to be otherwise, and then they had a right to stand upon the warranty of the manufacturer, instead of rescinding or offering to rescind the contract of purchase.

As to the damages resulting from delay, these had already been sustained when the mill was received; its reception, in so far as it affected them at all, could only hinder more from accruing; it certainly could not increase them. There was no inconsistency between reception of the machinery and retention of the claim for damages on account of delay to furnish it by the time stipulated. To hold that there was a waiver by implication would be very unreasonable.

It was also urged that the purchasers lost the right to go upon the manufacturers for charges or reduction of price in consequence of the machinery being inferior; because it appeared, or could be made to appear by evi-

dence, had the evidence not been improperly rejected, that the mill was not in fact used by the purchasers, but was sold or transferred to a corporation created to run it. We are unable to see how any sale or transfer made by the original purchasers would protect their vendors from duly accounting to them upon any covenant or warranty connected with that purchase. Such covenant or warranty would not pass with the machinery to the corporation or second purchaser, so as to shift the right of action to the new party. No principle is in sight which would either divest the first purchasers of their right of defence as against the purchase money, or invest the new party with any right whatever as against the manufacturers or first vendors.

8. It was complained that general questions to a witness on the stand who was one of the parties were not proper questions; that he ought to have been interrogated specifically and not in a general way. We think there is no rule that requires a party, when a witness, to be examined differently from other witnesses, and that to ask him to state the facts and let him state them, is a proper mode of examination. If anything comes out in the course of his statement that is not admissible evidence, it can objected to, and in this case might have been objected to. There was probably some of the witness's evidence that was objectionable; but it was not objected to. The mode of question was the point of objection, and we think the ruling of the court was correct. Section 3879 of the code, as to examination by written interrogatories, does not apply when the witness is under examination orally in open court.

9. It was complained that some evidence was rejected; and we think some of it was probably admissible, but its rejection would not be cause for a new trial, under the view we take of the case.

10. The verdict was for so much with interest, no time being specified from which interest was to be computed. For this reason, the verdict is alleged to be wanting in sufficient certainty. We think, as the principal found was less than the last instalment of the price, the legal import of the verdict is that interest is to be counted from the maturity of that instalment. And the time of maturity is fixed by the written contract declared upon. *Id certum est quod certum reddi potest.*

The court did not err in denying the motion for a new trial.

Judgment affirmed.